Next case is Warner Chilcott and Huffman LaRoche v. Teva Pharmaceuticals USA, Inc. This is a very different record on summary judgment. And the focal point here is the requirement of a reasonable expectation of success, which is a critical and factual element of the obviousness analysis. But don't the references which serve the basis of the earlier decision and are in this case they do relate to, was it Risadronate? Risadronate. Risadronate. And they describe doses of $5 or 5 mg a day, talk about monthly dosing, which by my arithmetic comes up to 150 mg a day, and you've got Ris talking about the total dose they're in. You've got a decision. I know it's a summary judgment decision, but there's at least some respect, if not informal deference, to the district court. I mean, you've got an uphill battle here, don't you? I respectfully don't think we do, Your Honor, because of the evidence that was put in in the very different record in this case. And our witnesses, including researchers who were doing this work at the time, explained in detail, with reference to specific data, why a person of ordinary skill in the art would not have expected a 150 mg dose of Risadronate to succeed. And there are three categories of evidence that they presented. The first has to do with what the prior art taught a skilled artisan about Risadronate's bioavailability at high doses. The second has to do with skeletal retention of Risadronate over a monthly period. And the third has to do with the safety of 150 mg dose of Risadronate. With respect to bioavailability, there was very little known in the art about the bioavailability of Risadronate at any dose. What was known was that it was linear up to 50 mg. But there's a strong debate in the record among the experts as to what would be inferred from that record at 150 mg. Our pharmacokinetics expert, Dr. Mitchell, referred to five specific studies involving four different bisphosphonates that showed non-linear bioavailability at high doses. Now, this is different from what was... Much higher than 150, right? Yes, Your Honor. In the 0-400 range or something? But what that shows is that there is some threshold somewhere for those bisphosphonates where the bioavailability goes from being linear to being non-linear. It might go back. It might indeed. But that's the point. Why is this different from the record that was in Hoffman? My understanding, and certainly at least from reading this court's opinion, is that there was no testimony from someone like Dr. Mitchell saying that the linearity of bioavailability was not known at that point and, in fact, that the studies taught against inferring bioavailability being linear all the way up to 150. There was also no evidence of skeletal retention. And that is something that this court called out in the Evandronate opinion at the end, saying that's an important component and there's nothing in the record as to this. Here, there is evidence in the record. Dr. Mitchell referred to a study that he conducted, published in May 2001, that showed that over a monthly period, he was looking at the dosing of risedronate, the specific compounded issue, intravenously, not orally. But he found that over a monthly period, 85% of the risedronate that had been given had been excreted from the system and so was not sitting on the bone able to do the work to fight osteoporosis. The defendants have no evidence about skeletal retention of risedronate. Their expert, Dr. Yates, tried to make an inference from a study of alendronate, a different compound, being dosed on a weekly basis. But Dr. Mitchell refuted that by pointing to a study that Dr. Yates himself co-authored in 2000, showing that risedronate has a much weaker rate of skeletal retention than alendronate does. So it's not proper to make an inference. The good thing is that there are a lot of potential facts here and that summary judgment was an error. Not that we should find for you, but that we should send it back. Correct. It should go to a trial in front of a jury and it will be a jury trial now because at least two of the defendants have launched their products. So these are factual questions that should be resolved by a jury determining the respective credibility of the expert witnesses. There's easily a factual issue as to skeletal retention. I don't know that there's a meaningful dispute. I think arguably we could move for summary judgment our way on that issue. If we haven't done that, we're content for the case to go to trial. Is this a Hatch-Waxman case? This is a Hatch-Waxman case, Your Honor. But since the case has been on appeal, two of the defendants have launched generic versions of the product. We pled a request for a damages remedy in the event that that happened. So if it went, and I believe at least Apotex and possibly one other defendant has made a jury demand. So this would go to a jury and we submit that's what should happen. Now in addition to bioavailability and skeletal retention, which we've discussed, there's also the question of safety. Now we had our experts testify that nobody had swallowed 150 milligrams of Resedronate at the relevant time here, and there were significant concerns that if somebody were to do that, there would be gastrointestinal, esophageal risks that were preventing people from trying that level of dose. Dr. Bilzekian specifically talks about a study where 150 milligrams of Pamidronate, a different compound, had to be discontinued. The study was never completed because a number of the subjects were experiencing erosive esophagitis because of the strong dose. And again, in this respect, is this record different substantively, not just by name of witness, but substantively from the Hoffman LaRoche record? I believe so. Again, I don't have the familiarity with the record, but certainly reading the court's opinion in that case, there's no discussion of evidence put in in that case with respect to the safety of the particular dose that was claimed. And here, the factual evidence put in not only by Dr. Bilzekian, but also Dr. Schofield and Dr. Gately, much of which has regrettably been designated as confidential by third parties, so I can't discuss it in open court, but the court has our confidential briefs and has the appendix. These are people who are not just brought in for litigation, read the references, and gave a conclusory statement as to what their opinion was. These are people who were doing the research at the time and explained why the prior art was directing their research away from a single monthly dose. And this dovetails with our evidence of objective indicia of non-obviousness, which this court has said in many cases are sometimes the most probative and cogent evidence of non-obviousness in the record because they help us avoid hindsight. They help us avoid taking the claims of the issued patent and using them as a road map through the prior art. They tell us what the skilled artisans were actually taught by the prior art at the time. Now, here there's no question there was a serious need for a dosing of a treatment for osteoporosis that was not daily or weekly. Dr. Bill Zekian testified to that based on his own practice. The problem is that we have the earlier case and all these compounds have some similarity and they're all mentioned, all is a strong word, but several of them are mentioned in several of the references, including monthly dose, total dose, and amounts that translate to 150. And we're talking about obviousness. We are talking about obviousness on a summary judgment standard, Your Honor. This court was very clear in the Proctor and Gamble case that not all bisphosphonates are alike. They have different physical pharmacokinetic and therapeutic properties. And so it's important, as this court has said repeatedly, to analyze each obviousness argument on its own facts and on its own record. And that fundamentally is the difference we're relying on. We do not think this court needs to overrule or in any way question the prior decision. This is a question of distinguishing the prior decision based on the different record here and the different chemical. And Dr. Mitchell was talking about this particular chemical. The studies about skeletal retention that Dr. Mitchell cited with respect to resedronate have no analog in the prior Evandronate case. That was just not an issue that was raised. And it is essential here. It's critical. The secondary considerations or the objective indicia in this case are also different. There's no question as to the need. I think the only reason, and the district court didn't deny it, I don't think the defendants denied it. The only issue there is that the district court made a legal error as to the appropriate date to be considered. Once that is corrected in accordance with this court's decisions in Texas Instruments v. ITC and Chief Judge Markey's decision in the Panduit case, then it's clear that that needs to be reconsidered because the need goes back to 1995 when people first started taking Fosamax on a daily basis, which had very onerous dosing restrictions. And Dr. Bilzekian said his own patients didn't want to take the medication daily or even weekly because of how difficult it was to take. So there was clearly a need and it was clearly long felt at the very least. There's a reasonable dispute of fact on that. And then relatedly with respect to industry skepticism, we put in significant evidence from, again, the people who were doing this work at the relevant time who were skeptical of a monthly dose of resedronate. Dr. Bilzekian talks about how both Merck and the Alliance for Better Bone Health studiously avoided going to a once-monthly dose. Dr. DiFotis, who wrote one of the cited prior art references, said, if I thought that I'd invented once-monthly oral dosing or that I'd made it obvious, I would have claimed that in my patent application. But she didn't, and in fact she withdrew an example that had once-monthly dosing of alendronate because she didn't think it would work. She and her team did not think it was a feasible venture. And Dr. Gately and Dr. Schofield make similar statements, again, under seal. The district court's order does not even mention this, and that on its own would be a basis for arraignment. Does feasibility in that testimony equate to the question of expected success? We cite it as evidence of skepticism, as a secondary consideration or an objective indicium of non-obviousness. So that's how we're using it in that context. I think the reasonable expectation of success question has to do with, would someone have figured that by pursuing this line of, pursuing the claimed invention, they would have been able to treat or inhibit osteoporosis, which is the language of the claim. They don't have to show that they would have gotten FDA approval for it. We're certainly not arguing that. But here there is plenty of evidence, and I think Dr. Mitchell's testimony is the strongest on this, but a close second is Dr. Dilzekian, saying that in the art at the time, people were not expecting that this would work, and in fact they feared that there would be significant safety issues because of the risk that there would be a spike in bioavailability, making it toxic, or that the skeletal retention would not be enough such that it would all slough out of the system before you got to the next dose a month later. The final issue that the district court talks about in terms of objective indicia is the district court found that there was simultaneous invention here. I think that is only explicable as an improper factual inference drawn against the non-movement. It relies on a particular email that Dr. Gately sent to one of his colleagues. Dr. Gately explained the context of that email and what his meaning was in his deposition under questioning by the defendants. The argument about simultaneous invention runs right into the fact that for decades we had interferences, which presume simultaneous invention. That's fair enough, Judge Lurie. I only wanted to make the point that that is yet another instance where Judge Stark unfortunately drew an inference against the non-movement on summary judgment. And so that is another issue that should go to the jury, and the jury can decide whether they prefer the inference that the defendants seek to draw from Dr. Gately's email or whether they believe Dr. Gately's own explanation as to what he meant when he wrote it. Unless the court has further questions, I've reserved the balance of my time. We will save your remaining time. Thank you, Your Honor. Mr. Siegrist? Yes, Your Honor. Your Honor, may I please report? I think a good place to start is with the very first sentence of the opening brief, where the appellants say that the patents ensued led to the first once-a-month tablet ever approved for any disease. You're not going to begin with an argument that you made that this court actually doesn't have jurisdiction over some of these and that the merits are irrelevant because lack of jurisdiction plus certain issue preclusion eliminates the need to get into merits? Well, I wasn't going to begin there, but I can speak to that. Well, let me ask you this. Here's how I'm thinking about it, which seems to me, I guess, the simple way. The April 1st Rule 58 separate page, separate judgments are, as far as I can tell, completely irrelevant. The fact is that Federal Rule of Appellant Procedure 3 on the Notice of Appeal, which is what you rely on, doesn't require reference to captions. It requires reference to judgments. The March 28 order at 838 expressly grants your motion for summary judgment of invalidity as to all eight cases. That order is a final judgment under Rule 54 appealable to this court. They named the judgment. It includes all eight cases, never mind consolidation, never mind anything else. Doesn't that eliminate the jurisdictional issue? It would, Your Honor, but I disagree that the summary judgment order was the final judgment. The summary judgment opinion was accompanied by an order directing an entry of judgment, and the clerk entered the final judgment, and he entered eight separate final judgments in the eight separate cases. Those are the Rule 58 separate judgments. If they had never been entered, the March 28 order under Rule 54 was an order disposing of everything left in the case. That's why three days later, as a formal matter, they just entered the Rule 58 thing. Rule 54 says a judgment is anything that's appealable. Something that ends the entire case is appealable. Federal Rule of Appellant Procedure 4 says the Rule 58 stuff can never work against the appellant, so I don't understand what the issue is here. Because that summary judgment order was not appealable until there was an entry of final judgment, it might have become appealable if there had never been an entry. What authority do you have for that? That seems to me just flat out wrong, so I'm curious why you say that. Rule 4 deals with, I think it's Rule 4, or no, it's Rule 58, Your Honor. It says that if there's a failure to entry judgment, then after a period of time... But that's purely protective of the appellant. That says, and Federal Rule of Appellant Procedure 4A7H or something, says basically it can never work against the appellant that there was no separate Rule 58 judgment, which is, as you know, widely ignored in our federal court system. Your Honor, if they had entered a notice of appeal in between the grant of summary judgment and the formal entry of judgment, then I think there might be a decent argument that that premature notice of appeal would apply to all of the cases after the final judgments were entered. But that's not what happened. There were eight final judgments entered, and they specifically filed five notices of appeal. And now we're just circling back. I mean, it comes down to whether the March 28th order that granted your motion for summary judgment of invalidity as to all eight cases was a final judgment. Yes, Your Honor. That's enough for the other jurisdictions. Okay. Let's get to the merits. Yes, Your Honor. Why isn't your opponent's argument that summary judgment was incorrect, that there are genuine issues, there are different facts here, and it should go back? Well, Your Honor, there are not genuine issues here, and the facts are not all that different. Bioavailability, for example, was an issue in the abandonnate case. There was discussion about whether you would know what the bioavailability would be. In fact, in the abandonnate case, the monthly dose was not a linear extrapolation of the daily dose. In the abandonnate case, the daily dose was 2.5 milligrams. The monthly dose was 150 milligrams. To get from 2.5 to 150 milligrams, you had to look at another reference, Robbins, which said 2.5 milligrams or 5 milligrams are acceptable. So you've got those two options, and you could take the 5 and extrapolate that to 150. Here, you don't have both 1 daily dose. It's 5 milligrams. And the ultimate amount, the 150 milligrams, is just a linear extrapolation of that. If there were an issue with bioavailability, it's undisputed that the bioavailability at any given dose is readily determined. So if there were a nonlinearity in the bioavailability at some point, then the researchers developing this product, who weren't at Roche, by the way. They were at Procter & Gamble. But the researchers developing this product could have dealt with that and come up with an appropriate dose, just as was done in the abandonnate case. But they didn't have to here because they got the expected dose. On this, on bioavailability, one point- They could have dealt with it by using something other than a 150 milligram dose? Yes. That would be outside the claim. If a different amount were necessary, they could have done that. But they would have had a reasonable expectation of success on coming up with a monthly dose. But not a reasonable expectation of success as to the claim dose. Well, the 150 milligrams is the expected amount. And this is what I was just about to point you to. In the record on page 11452. This is testimony from Dr. Schofield. Dr. Schofield is a researcher at Procter & Gamble. They're the ones who developed the Resegen-A products, not the researchers at Hoffman and Roche. And she's describing here- Yes. She's describing here the research that was done. And I won't read aloud what it is because this is part of the material that doesn't get a confidential. Which of the four mini-pages is it on that you want us to look at? Yes, Your Honor. All right. It is- I'm sorry. You're consuming scarce time. Yes, Your Honor. I apologize. And you've got an assistant here. It's 11433. I'm sorry. I was on the wrong page. That's why I couldn't find it. 11433. And it's at- the mini-page is 408. And it's line 22. And she's talking about a finding at one particular dose. But what's interesting is what was unexpected and what wasn't unexpected. If you look at it here, it's not linearity that's unexpected. Non-linearity is unexpected. The reasonable expectation was linearity. If you continue on to page 1145- And this is your witness here? I'm sorry? Is this your witness or the other side's witness? This is Dr. Pamela Schofield. She is a researcher at Procter & Gamble. Procter & Gamble was the original plaintiff on this. They were a licensee of Roche. They're the ones who developed the Axanil product. Being deposed as a fact witness here. We did not proffer her as a witness. But it was taken pursuant to the subpoena. But this is one of the main witnesses they point to. As saying that there was uncertainty. That you didn't know what you were going to get. Clearly when she's doing this research she did have expectations. And reasonably expected to be successful on linear dosing. And on page 11454, this is mini page 492 in her deposition. Shows that after that one aberration, that one unexpected spike. When you get up into the range that we're talking about here. It goes back to what they expected. Back to the dose proportional amount. So in between getting what you actually expected. And that being just a dose proportional extension. And even Dr. Mitchell admitting that if it hadn't been dose proportional. You could come up with the appropriate dosage. You have a reasonable expectation of success on coming up. With an appropriate monthly dosage for Resedronate. And what you would most expect is 150 milligrams. Until you're proven wrong on it. And nobody was ever proven wrong when they were developing it. On skeletal retention. Skeletal retention may be different for different drugs. But it had no impact on reasonable expectation of success here. The issue of skeletal retention would be that the drug dissociates from the bone. The way these drugs work. They go into the bloodstream. They actually attach to the bone. And during the remodeling process. They affect the way that osteoplasts and osteoblasts work on the bone. So what Dr. Mitchell was saying is that Resedronate may come off the bone. Differently from some other bisphosphonates. But the language in the claim is that there is a monthly dose. So there is a one month gap in the dosing. The only issue for skeletal retention. Would be whether enough stays on the bone to last a month. That was not. There is no genuine dispute on that issue. Because the prior art showed that you could go more than a month. Without a dose of Resedronate. Specifically, the Zagel's reference we cite. Zagel's is. Let me start with Delmas. That was even earlier. The Delmas reference we cite. Delmas is not a loading dose. It's a 12 week cycle. The first two weeks, 14 days. Was administration of 30 mg a day of Resedronate. And then you have a 10 week dose free interval. And that's repeated over and over. No separate loading dose. It's the same cycle. Repeated over and over. So that 30 mg a day times 14 days. That's 520 mg. Over a 12 week period. That's equivalent to 5 mg a day. Exactly. The daily dose later approved for Resedronate. How long in that study did the 10 week interval portion run? Because the initial piece is, what, 30 mg a day for two weeks. Yes, Your Honor. That's a lot of drug. Yes, that's 520 mg. And then you go 10 weeks with no drug at all. So there's a total of 12 weeks in the cycle. Two weeks on, 10 weeks off. So how long did the 10 week intervals go? Did they repeat the 14 to 20? Yes. After 10 weeks, you go back on for two weeks. And then 10 weeks off. That's why it's not a loading dose. It's the same cycle. There may be quite a lot in the system. The same 12 week cycle repeating over and over. But the cumulative dose over 12 weeks, 520 mg, was exactly the same as the 5 mg daily dose. And what Zagel showed is that you had the same efficacy over that 10 week gap that you had with the daily dose. So if it lasts 10 weeks, there's no concern about whether it's going to last a month. Whatever is going on with skeletal retention is not preventing it from lasting a month. No person of ordinary skill in the art would have had any concern about it lasting a month. You get the same... I just want to ask. Am I understanding right? So at the end of the two week period, there's whatever is left of the 420 mg from that two week period. That's 30 times 14, is that right? 520, yes, Your Honor. Whatever. And then during... So you know that with the 10 weeks that go by, that there's enough with that, I don't know, pretty high dose to last. So what is that necessarily, which I think is what we're looking for in the judgment, tell us about 150 mg a month? Well, it's not the 150 mg that it's telling you something necessarily about. What it's necessarily telling you about is that a one month gap in dosing is not an issue. But it might depend on how much you put in at the beginning. But that's... And remember how I got us to here. We're talking about skeletal retention and whether there's a factual question about skeletal retention. Skeletal retention is not about how much you take. That's about it staying on the bone when you're not taking it. Does something say that if you put a million milligrams on the bone that that leaves the skeleton at the same time as if you put 20 milligrams? That's a total dose concept. And there would be an upper limit to it, but it's way outside the ranges we're talking about here. The total dose concept that was confirmed for all of these drugs in different tests is that what matters on these is the total amount of drug that's administered over the interval, not the frequency of administration. And it's because this drug operates differently than drugs that are metabolized by the liver. This drug goes into the bloodstream, attaches to the skeleton, and then it operates on the cells that are remodeling the bone. It doesn't ever have to be metabolized like drugs in the liver would be. That's why you get this total dose concept, which was well-established for misphosphonates, including evandronate, including resendronate, including alendronate. And that was where it first came up was, yes, there was this concern that your initial dose, the daily dosing on alendronate was causing problems. That concern was solved by the one-week dosing regimen that was come up with for alendronate. Your time is up, Mr. Sedgwick. Your Honor, I have a further question. Thank you, Your Honor. Mr. Fleming has a little bit of body time. Thank you, Your Honor. Mr. Segrist indicated that there was discussion of bioavailability in the prior evandronate opinion. It's true it was discussed, but it was used in a very different way. Roche was relying on it as a way of trying to prove an unexpected result. This court said that it was not relevant for that purpose. We are using it in a very different way, which is to show that a person of skill in the art would not have expected that 150 milligrams would produce sufficient bioavailability to be effective, but not also be toxic in the event of a spike. Mr. Segrist also said that the extrapolation from 5 to 150 milligrams was, quote, just a linear extrapolation. I wrote that down because that presumes that bioavailability is, in fact, linear. But that is exactly what Dr. Mitchell and Dr. Bilzekian said was not taught at the time of the invention in May 2002. The discussion of Schofield on page 11433 of the appendix that Mr. Segrist discussed, I think it's very important to note that the study that is referenced there is post-patent. That is a study that was done after May 2002. It is not prior art. Now, we use it on page 27 of our blue brief. But he says that that testimony says something like, what a surprise that was. Hence, we expected the opposite. Well, but at that point, the patent had already made its disclosure that 150 milligrams of resedronate would work. And in that context, it may well have been unexpected. We use it in our blue brief as evidence that, in fact, it was impossible at the time, or at least one would not have reasonably expected success before the patent revealed the discovery that there would be linear bioavailability at a dose as high as 150 milligrams. The reference to Zegels and Delmas, first of all, the Delmas reference was before the patent office in prosecution of the 634 patent, which I think is highly relevant. Dr. Bilzekian references and distinguishes that reference in his report. He talks about how Delmas involved a study of patients with breast cancer, which has its own separate bone disease associated with it. And also, the study itself reported no difference in femoral neck bone density in patients who got the resedronate pursuant to the Delmas regimen compared to people who got placebo, whereas if they had gotten daily administration on a continuous basis, there would have been an improvement in bone density. So Dr. Bilzekian says that one would not have inferred from that that that particular regimen would  And particularly with respect to Zegels, Zegels itself says there are no definite conclusions about the degree of suppression of bone turnover induced by resedronate that can be reached from such a short-term study. And Dr. Bilzekian calls that out on 12483 of the appendix. The point is that this is a situation where you have experts who have reviewed the references. They have given their understanding of what the art taught at the time. There was very little discussion of objective indicia in Mr. Segrest's presentation. And certainly, if it was so easy, if it was all just a matter of basic arithmetic, then why was nobody trying it? Why were they doing these highly contrived regimens like Delmas and Zegels involving daily administration for 24 days, waiting 10 weeks, then doing it again, or a loading dose like in Schofield followed by a maintenance dose? The reason they were doing this is because they were highly skeptical that a single monthly dose would have worked. And at the very least, there's a genuine issue of fact warranting a trial on that question. Thank you, Mr. Fleming. Thank you, Your Honor.